Let's proceed to the second case of the day. Markow v. et al. v. Southwest Airlines. Ms. Holyoke, is it? Good morning, Your Honors. May it please the Court, Melissa Holyoke from the Center for Class Action Fairness on behalf of Objector Appellants Markow and Paul. Your Honors, this settlement must be reversed based on the recent rulings in the Seventh Circuit in Redmond v. Radio Shack, which is at 768 F3rd 622, and in Pearson v. MBTY, which is at 772 F3rd 778. And in those cases, the Seventh Circuit made clear that as part of the District Court's Rule 23e analysis on fairness, the District Court must consider the allocational fairness, and that is the division of the settlement pie between class counsel and the class members. But isn't there a real distinction between Redmond and Eubanks, which you also rely on, because the class members in those cases were not being made whole by the coupons provided for in class relief. In this case, they are being made whole. They're getting their drink coupons. I think there's two responses to that. The first response is factually they are not made whole. This case was about expiration dates. So the class members, they bought a plane ticket, and with that came a coupon without an expiration date. Southwest stopped honoring those, and so the class action was filed. And in response to the settlement, the class members receive a coupon with an expiration date. I think there's no question that a coupon without one is much more valuable than a coupon with an expiration date, particularly when, as here, you have to buy an airline ticket to actually use it. So it's more valuable because? Without an expiration, you can use it indefinitely. Indefinitely. So you're not forced to purchase? Is it your position that we should factor in the age of the person who holds the coupon so we could determine the lifespan of each person in receipt of this new coupon? No. Would that be a factor? No, I don't believe so, Your Honor, because it's really beside the point, because here we need to look at adequacy. And this is in Redmond and Eubank. Redmond is instructive here. There, the court, there was $10 coupons that received in the settlement. And there, the court, the Seventh Circuit valued those at $500,000, and there was $1 million going to the attorneys. The court there said, okay, this relief is probably adequate, right? So we don't need to increase the value of the total size of this, but we need to look at the proportion. And here, we're not challenging the adequacy here. We're not arguing that the coupons, that that was not an adequate relief. But you need to look at the settlement pie as a whole. What is the class counsel getting? What are the class members getting? The class counsel cannot be the ultimate beneficiaries of this action. But I think this goes to your second point. Let's assume that they received exactly what they got, and that this settlement, even though it was $4.5 million, really should have settled for $2 million. They overpaid for it. Why should the attorneys get the windfall? That makes no sense. This should be allocated proportionally. Let's assume that there was a windfall. The class counsel should not get that. It should be divided fairly among the class members and class counsel. And here, it was not. But the bigger problem here is the district court never even considered the allocation of fairness. Instead, the court said, this is adequate, coupon for coupon, end of story. But we know from Redmond that that's not enough. Well, actually, we don't. As you know, I was on both the Redmond and Pearson panels. And I frankly agree with much of the general principles that are set forth in your brief, which make an awful lot of sense in class settlements where the class gets peanuts and class counsel walk away with millions. Of course, you all have made a business out of challenging such settlements. But here, the decisive factor for the district court seems to have been, as Judge Williams pointed out, that this class basically got all it plausibly could have expected to get out of a lawsuit. And so I'm wondering why this very, very unusual circumstance, at least in my experience with class settlements, doesn't kind of indicate a limiting principle, a very practical limiting principle, because this relief doesn't happen for free. Well, I think, again, I would say factually I would dispute that they got everything out of it. The difference between a coupon good for a year and one that might be good indefinitely but the yearline says is worthless, that has no cash value, is not too compelling, frankly. Okay, but you also have to consider what was filed in the complaint. The class members didn't argue, okay, we have these indefinite coupons. I'm asking for a declaratory judgment that you honor these coupons. They asked for cash. And that was under state consumer deceptive practices acts, right? And they also argued for contractual. Well, the breach of contract just gets you another coupon, right? Well, not necessarily. You can get damages. The consumer statute. The damages are one free drink on an airplane after you bought a ticket. This is pretty trivial stuff. But they brought consumer fraud claims under state statutes. And I guess I'm not sure that really solves your problem there because, first of all, if those claims are treated as viable at all, then there are fee shifting statutes that apply. And that puts us clearly into the realm of Lodestar fee awards, which you don't like in this case, and into the realm of fee awards that can greatly exceed the relief awarded. On the other hand, if we say, as we perhaps should, those claims were non-starters to begin with because of the Airline Deregulation Act preemption that applies to them, then we shouldn't pay any attention to them at all. So I don't see how those claims help you. Well, I think there's a big distinction here. I do think Redmond is appropriate here because I think what we're concerned about is, okay, you had an out-of-pocket loss, right? We're having a contract claim. You have an out-of-pocket loss from that. And you're being completely compensated, and that's what the argument here is. Well, in Redmond, there was no damages whatsoever. It was a statutory claim, correct? And they received a $10 coupon in that. It doesn't really make a difference. But had claims on the order of $100 to $1,000 per person from a company that was on the edge of and has since gone into bankruptcy. Sure. And, again, that goes to adequacy. And it's similar here. I'm not arguing that that $5 coupon was not enough, and I didn't argue that below. But if you're looking at the coupons plus what the counsel is getting, you have to divide that fairly. There's no reason for the class counsel to be the primary beneficiaries of this. Ms. Holyoak, was there an injunctive aspect to this settlement? There was, Your Honor. And that was the promise never to do it again? Yes, exactly. Okay. Does that play into our analysis of the value of the settlement or the appropriateness of the fee? I don't believe so, Your Honor, for several reasons. First, they never, in their fee request, argued that the injunctive relief should serve as providing the value for the settlement for their fee request. I think also if you look at that injunctive relief, it provides prospective relief to future customers. And under SinFuel, we know that that's not real relief to class members who've been injured for their past injuries. Now, this settlement, in terms of the drink voucher tickets, when they got their new vouchers, not only were they good for one year, but they were fully transferable. Isn't that right? Sure. And then in terms of the fee that was actually given, they had negotiated this fee between $1.7 million to $7 million, and then ultimately agreed to $3 million for class counsel. But using that Lodestar methodology, the district court reduced it to $1.3 million. Correct. I just don't understand why that district court's use of that methodology was not appropriate. Well, I think the larger problem here is with that separate fee negotiation agreement. And here I think Pearson is instructive. Their class counsel said, yes, we have this separate fee negotiation, so it's a benefit to the class. And the Seventh Circuit said, no, that's not realistic because defendant is a rational economic actor, and when they're making these decisions, they consider the bottom line. And to the reversion, the Seventh Circuit said there should be a strong presumption against its validity. And there, the Seventh Circuit panel said they could find, quote, no justification, close quote, for such a clause. The same structure is here. And we would say that the clear sailing plus the reversion should be per se unfair because if you think about it, class counsel are the fiduciaries of this class. They should not agree to a settlement structure where defendants throw in $3 million on the table. If the district court had said pay that $3 million, they would have had to. Putting that on the table and then allowing the structure where if there's a lower fee, that Southwest gets to take that money. They should be fighting for the class and for the fact that if that money, if there's a lower fee, that money should go to the class. Do you have any objection to the claims process in this settlement? No, I do not, Your Honor. It looks about as easy as one can imagine. No, but you, yes, I don't have an objection to that. But you have to, the claims process yielded what we had expected, approximately 8%. We had generously assumed there would be 10% which resulted in what we value at 1.5 million coupons compared to the $3 million of agreed fees. That's twice. In Redmond, no, I'm sorry, I apologize. In Pearson, there was $800,000 in claims and a $4.5 million. They've called that absurd. There's no reason why where you have a 1.5 million coupons here and $3 million in agreed fees, twice as much. They're agreeing to twice as much what the class actually assumed. But the bigger problem is that the district court made no attempt to even determine what the class actually assumed, actually received, because the claims period was three months after. Ms. Holloway, can I ask you about a couple of other issues? Sure. One is this conflict of interest involving one of the class representatives. Sure. Do you, given that we are seeing a settlement that essentially gives class members complete relief, at least, or very close to it, do you see any remedy for the conflict of interest short of vacating the entire settlement and remanding? Here I do not. And the problem there is because we know about this relationship right now, which was in place when the settlement was negotiated. We have no idea how that relationship tainted. The class representative and Mr. Siprit, class counsel here, are lead counsel in a different case. As you know, if a fee was awarded in that case, there are negotiations over how those are allocated, and that could have easily tainted the process here. Okay. And then I also would like you, if you could, to address the split opinions of the Ninth Circuit in the H.P. Inkjet settlement case. And my specific question is looking at the so-called Coupon Settlement Statute, Section 1712. Could you explain to me, under your theory, what work Subsection B does as distinct from A and C? B describes what the process is. A describes that you need to have the fees calculated based on the coupons that are redeemed. B explains that if you have more than coupons, the process is that you have to have, you can have load star for that portion that are not coupons. C explains, how does that work all together? And I believe that's how the H.P. Inkjet panel viewed those provisions to work together. Which part of B are you considering? I'm not sure I follow your answer. Okay. Because Subsection A says if you are seeking fees based on coupons, and it's all coupon relief, you need to base it based on the amount of coupons that are actually redeemed. Subsection B says... Unless you're dealing with load star or some other fee-shifting statute, right? Yes, yes, exactly. Well, not load star, but some other fee-shifting. Or injunctive relief. Well, and that's how B comes in. That says, okay, let's say that the attorney comes up and says, I'm requesting this fee. I'm basing this fee request on the coupons that were provided, as well as this injunctive relief that's provided. That looks like C. That's what C clearly applies to. Yes. So what does B apply to? It explains that the load star must be used with that other relief. A and B are telling you the methodologies. C is providing you how those methodologies are implemented in a different type of settlement. I confess that I understood Judge Berzon's dissent much better than I understood the majority. I think Judge Berzon's dissent is very contrived in her textual analysis. The majority opinion goes through quite lengthy on how all of that must work, and I think there's some major problems with the dissent. Particularly, she ignores completely the language of shall in both A and C. When the fees should be calculated for coupon settlements, it shall be based on the amount of coupons redeemed. And she ignores that completely. I think what Berzon does is she thinks of the result. Okay, the result is that the statute's telling me I can use load star contingency, and then she backs into that and tries to explain. But the problem is if you look at what this statute was designed for, it's designed to depress these coupon settlements. Generally, yes, but we have to worry about the details. Absolutely. But under Berzon's view, it doesn't change anything. She says you can use contingency or load star. How is that different from when it was prior to its enactment? Nothing changes. She also substitutes words that make no sense. For example, she changes the word attributed to the coupon settlement in Section A and tells that that should be as a percentage of the fee award of the total coupons awarded, language that appears nowhere in that statute. The district court here rejected inkjet, right? Yes, it accepted the dissent's view. So let me ask you this because I want to see how far you're going with this. Do you think a district court can ever award fees based upon the load star method in a class action coupon type case, or must it always use the common fund doctrine? If the fee award is based solely on coupons, then it must follow 1712A and award fees based on the coupons that are actually redeemed. And the other question is, because you mentioned the kicker provision and clear sailing, those clauses are only problematic when there's collusion, and we have a district court finding here that there was absolutely no collusion in this case. Why shouldn't we rely on the district court's finding? I disagree that they're only problematic when there's collusion because there doesn't need to be collusion. We're not arguing collusion, and no collusion was argued in Pearson, Redmond, or in Eubank. There was no subjective collusion, no smoke-filled room there. What we're looking at is the objective settlement, how it's valued, and the fact that the class counsel were the primary beneficiaries of that. Is there any evidence that Representative Levitt was, in fact, inadequate? To represent the class? Well, we know that he had a relationship with class counsel. Right, but there was another class representative. There was another class member, yes. And that class representative, you're not alleging that representative was inadequate? No, we are not. But the problem with certification, that might be a problem, but it does make a problem in settlement because we have no idea how that relationship played into the negotiations. One might not have saved the other, in other words. So you don't have any evidence one way or another? No, I do not. No collusion? You don't have any evidence that would show that it was tainted other than the fact of that relationship Levitt had? No, we do not. Do you want to save some time? Yes, Your Honor. Thank you. Mr. Sippert? Good morning, Your Honors. May it please the Court, Joseph Sippert on behalf of the Appellees and the Cross Appellants, that's the plaintiffs in the settlement class below. This is a case, if I may repeat the mantra from my various briefs, this is a case in which drink coupons were taken away from people and under the settlement, drink coupons were given back to people. So you can't really do much better than giving back to people and recovering for the class the very thing that was taken away from them, the very thing that led to the case. That was the way I viewed it when we tried to settle the case, and that's the way I continue to view it today. I think we got a great result. I do want to clarify two quick points on that. Your Honor, you asked about whether there was a consumer fraud claim asserted at one point. The answer is, yes, there was in the original complaint. However, there was motion practice on that. Ultimately, that count was dismissed under the ADA. So there is no longer, or there wasn't when the settlement was approved, a live operative count for consumer fraud. I just wanted to clarify that so there was no confusion or thought that a fee-shifting analysis could apply. I think that Lodestar – It could. Well, not for that reason. It would be a loser of an appeal, but you would have appellate rights. That's right. I mean, believe me, I'm going to make hopefully persuasive arguments about why the court is at liberty to utilize Lodestar as the lower court did below. Before you get into that, could you talk about the conflict of interest here? You and Southwest have a kind of Alphonse and Gaston routine in your brief, saying each is going to explain it. Neither one of you did. If that's the case, I apologize. I think that in our brief what we said is that Mr. Levitt is a class-action lawyer. No one disputes that. It's not a secret. He's a very well-known class-action lawyer. I'm a class-action lawyer too. I don't think that alone creates a conflict. But more importantly, if there were a conflict, which is evidence of collusion or whatever else, you would think that would be reflected in the settlement. And as Your Honors noted earlier, it's not. Well, it's also something that ought to be disclosed, that relationship ought to be disclosed to the class members, to the district court, and I'm very troubled by that. Having one unconflicted class representative really doesn't solve the problem because of the decision process to approve a settlement. If we think there's a problem with the conflict of interest, do you see any remedy short of vacating the settlement and remand that would be appropriate? Well, I understand the point. With respect, however, I don't accept the premise that there was a conflict. I don't think we can ---- Well, we might disagree with you about that. I'm asking you if we do, can you suggest any sanction or remedy that would be appropriate short of vacating the settlement? Yes. The answer is, in theory, the court could find that Mr. Levitt is, what's the right word, not barred, but no longer deemed to be adequate as a class representative and would be removed. That would leave one in his place. Why don't we ---- Well, what about, for example, removing the special payment made to him, perhaps a little more, and doing the same for you? Well, two different points there. I think that commensurate with the removal of Mr. Levitt as a class rep, this is purely indulging the hypothetical that we get to that point. I understand. I think it would probably follow that some portion of the incentive award might need to be also taken off the table. On the other hand, the fact remains he did genuinely participate, as the other class rep did, through all aspects of the case. The fee award, however, is a different story. I mean, that's what we're talking about today more broadly. And so I still want to get the question answered, why wasn't it disclosed? Why wasn't the relationship disclosed? There was never a secret about anything. I mean, there were two class reps. Southwest took Mr. Levitt's deposition. They asked him a bunch of questions about the relationship and, you know, tried to make hay and see if there was an angle there. Ultimately, they didn't do anything with it because there was no conflict. And that's really what I want to emphasize here is that all this stuff about disclosure, to be clear, if there is a conflict, I mean, if there was actually a conflict between me as class counsel and the class rep, they wouldn't be there in the first place. I mean, this is what I do for a living. So it's not a good practice, in addition to being not ethical, to have class reps who are conflicted. So I never do that. If by some freak circumstance or set of circumstances I ended up in that situation and I thought there was something to disclose, it would be disclosed. Here, I don't agree with the premise that there was a conflict. Mr. Levitt is a lawyer. He does class action work. On that basis, I don't think it can be correctly said there's a conflict. The point you're avoiding, the point which is far more specific, which is that you and he are co-counsel in another case, not just that he's a class action lawyer. I'm not trying to avoid it, Your Honor. I absolutely acknowledge it. That is true of Mr. Levitt and Fife. Meaning that you have a much more extensive financial relationship with each other that could obviously wash away as trivial the, for example, incentive payments or any benefits he might individually get as a class representative in this case. That's the concern. Understood. And I acknowledge, yes, we are co-counsel in various cases. That is equally true of probably 100, if not more, other people who do class action work. You all are class reps for each other? No, not that we're class reps for each other. That's the issue. My point, Your Honor, and I understand, I think I understand your point. I hope I do. My point is that it is probably true that there are at least 100 other people that come to mind that I am in the class action space with where I've been co-lead counsel with them. If any one of those people could never be a class rep in any class action because we all know each other and we all see each other in the same cases, that would effectively mean that a person like Mr. Levitt could never hire a lawyer and bring a class action. I mean, it's not like he's my father-in-law. There's no blood relationship under the law of the Seventh Circuit. Yeah, but see, you're co-counsel. You don't think there's even a perception of a conflict? Because to me it just sounds like everybody's feeding it to trough. If it's 100 of you and you're all like co-counsel in class action. I'm not suggesting that we're all being co-counsel. All I'm saying is then that really provides a great incentive for representing class members because not only do you get what you would be entitled to if you negotiate and you get something as a class member, but then you have the opportunity to get the fees too. I mean, I can understand why that structure is there because it certainly helps to make it more lucrative to bring the class actions. But what my question is, you don't even think it provides an appearance of impropriety to be co-counsel and the class rep? I think that under the law of the Seventh Circuit, which we all pay very close attention to, there are pretty, I would say, bright-line rules, guidelines, about who class reps can be and what the relationship can be between the two. Paolo Windows is probably the most recent example I can think of where the class counsel's father-in-law was the class representative. To me, it's clear that that is a no-go. It's equally clear you can't have a blood relative. You can't have your fiancé. I don't think it's at all clear that a lawyer who does work in the same area that you do, who you may even have a... Who is your co-counsel in another case. That's right. Even one who's a co-counsel, I don't think... So even if we agree with you, no real conflict. Let's give you that. No real conflict. We agree with your analysis of the Seventh Circuit cases. I mean, that's it. It was not disclosed. I think the obligation to disclose is triggered when there's a conflict. I don't think that there's an obligation to disclose a non-conflict. Because if I'm analyzing this issue a year ago or two years ago, I'm thinking to myself, is there a problem or not? Is there a conflict or is there not? If there is, let's disclose it or not do it at all. If there's not a conflict, what am I disclosing? The existence of a non-conflict. So no one was ever trying to hide anything. Judge Connelly knows Mr. Levitt. He appears in court before Judge Connelly all the time. Southwest deposed Mr. Levitt. I mean, there was no secret about any of this. We also had a second-class representative at all points in time. So it came out, but it didn't come out during his deposition. He was co-counsel. No, it absolutely did. Not only did that come out, but 100 other things came out that were not bad, but everything you ever wanted to know about Mr. Levitt and how he knows me was in that deposition. Because defense lawyers do what they do. They try to get to the bottom of things, and if they can throw muck on the wall and blow something up, they'll do that. No disrespect, that's their job. So the idea that this was somehow some secret is just factually not correct. Everyone knew everything. So, again, as far as disclosure. Is your position that disclosure occurred? My position is that I never filed a formal disclosure as such, titled Notice of Disclosure of whatever, a non-conflict. You're saying, in effect, the deposition reflects the disclosure. The deposition, coupled with the fact that Judge Connelly, as a practical matter, is a judge that Mr. Levitt appears in front of probably once a week, there was never any secret. Oh, no, I understand Judge Connelly recognizes his area of expertise, but what about Judge Connelly recognizing his being co-counsel? That's in a particular case. If that came out in the deposition, then I guess it's fair to say Judge Connelly is aware of it. I wouldn't go that far because I guess, as a practical matter, Judge Connelly probably never read the DEP transcript. The only way he'd ever know about it is if Southwest had filed a motion saying we're going to move to disqualify Levitt, which they didn't. Hang on, just help me. When was the class certified? The class was never certified on a contested basis. Okay, so it was only done as part of the settlement. So Southwest gets this ammunition, or it may or may not be significant from your point of view, never winds up using it and disclosing it to Connecticut. That's correct. I'd like to emphasize one other point here, if I might. I had a second-class representative. If I thought that there was even a hint of impropriety about having Mr. Levitt as a class rep, I could have just dumped him. We had other people. Not only that, I could have thrown a rock and gotten ten more because the class consisted of millions of people who fly Southwest every day. So I didn't need Levitt. I mean, the reason why we didn't go ahead. So I just want to, you know, putting the burden like on Judge Connelly is what troubles me, that somehow district judges are supposed to like proceed and we're supposed to add things up. I just wanted you to know, for me, that's not persuasive, because I don't think you can attribute that kind of knowledge to a district court. Yeah, and I don't think, understood. And I don't think that, to be clear, I don't think my position is, oh, there was no conflict because Judge Connelly should have figured it out and did figure it out. My position is there is no conflict because there's no conflict, and by the way, for what it's worth, I'm pretty sure Judge Connelly knew everything there was to know anyway, but that's not the standard. I agree with you on that. And to me, what may save you on this is the deposition, they did get notice then and then there was no, they didn't file anything. They didn't object to it. And that was before the settlement agreement. Yeah, that's correct, Your Honor. And again, we had the second class rep at all times. All I had to do was just tell Levitt, we don't need you anymore. Why didn't I do that? It's not because I thought that I would ever be having this conversation with the court. It was because I never thought in a million years there was any reason why he should be kicked off. So now that you've had this conversation with the court, let me ask you about going forward. Do you think that it might be prudent to disclose when you have this kind of situation in the future? Well, I'd go a step further, which is, handedly, having had this conversation, regardless of what the outcome is, I probably wouldn't have a class rep in the first place even involved that was even within 10,000 feet of the relationship Levitt had with me as a practical matter. So I don't want to ever be in a situation, nor did I think I was here, where I'm disclosing some conflict. I would rather just have a different class rep that didn't have a conflict in the first place. So if there was an error of judgment, then I apologize to the court. I really didn't think there was, and I'm still not sure in retrospect I can fairly be imputed with this issue, given the state of the law. But I hear the court loud and clear, so that's for sure. Mr. Super, thank you. With the indulgence of my colleagues, there's one other thing I want to take up with you. In your brief, in talking about the separate negotiated fee agreement, we see the following. This is on page 15 of your brief. An attorney's fee agreement negotiated after the terms of class settlement have been reached in granting fees separate from the class recovery is entitled to heightened deference. C.E.G. Staten against Boeing, 327, F. 3rd, 938, 964, 9th Circuit. Now, quoting, this is your parenthetical. Where defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class, ellipsis, the court need not inquire into the reasonableness of the fees, even at the high end with precisely the same level of scrutiny as when the fee amount is litigated. The issue is whether the fee is facially fair and reasonable. Have you looked at that opinion? Yes, Your Honor. Well, when I read that parenthetical, I thought that's odd. It seems kind of an odd way to put it, an odd view, frankly. And I looked. You know how much space is between, is covered by the ellipsis there in that quotation? It's two full pages of text that you deleted to completely distort the meaning. Let me read to you what the 9th Circuit actually said. That the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class. It's where you stopped and put your ellipsis. The 9th Circuit went on to say, if the agreement does not detract from the need carefully to scrutinize the fee award, ordinarily a defendant is interested only in disposing of the total claim asserted against it. The allocation between the class payment and the attorney's fees is of little or no interest to the defense, which should sound familiar to any reader of Pearson. So your ellipsis has completely distorted the meaning of the citation that you've provided. And then the second half that you quoted, here's what you deleted in that sentence. You deleted, and since the proper amount of fees is often open to dispute and the parties are compromising precisely to avoid litigation, the court need not inquire into the reasonableness of the fees even at the high end with precisely the same level of scrutiny as when the fee amount is litigated. But here there was no such inquiry at all, nor is the record adequate for an inquiry. This is just completely dishonest citation of authority. I'm very troubled by it, and I'd be interested in your explanation for it. Well, I can tell you that there's nothing that I take more seriously as a lawyer and an officer of the court than the accuracy and fairness of citations in my writing. I can tell you that I've made that argument with all respect, because I hear the court loud and clear, and I just want to give you my direct, candid response. I have made this argument or cited that case for that proposition many times, believing, as I did in this instance, that it is absolutely fair characterization and representation of the opinion. That's preposterous. I will tell you, Your Honor, with respect, why I saw things differently when the brief was written. I hear what Your Honor is saying right now, and I get it. But I'll tell you why in answer to your question. There's aggressive reading of cases, and then there is just blatant distortion of quotations. That's a different category. Understood. I would never challenge that principle. But I think that what the parenthetical says is that when parties negotiate, and I'm paraphrasing now, but when parties negotiate a resolution. If you want to argue the merits here, you're not getting my point. Thank you. Well, respectfully, Your Honor, I am hopefully getting your point. And I take it very seriously. I really don't know what else to say other than there was no intentional attempt to mislead. And my answer on the substance is that Boeing stands for the proposition, I think, again, fairly, that when there is a negotiated resolution on fees, the district court doesn't have to look at this in a vacuum. There ought to be some deference to the negotiated resolution. I mean, that's really the point. I have no reason to overstate anything because that general. You've answered my question as well as you're going to. Thank you. I see I'm out of time, Your Honors. There is the matter of whether the fee award and the claims rate ratio fits within the Pearson framework. I think that's probably my most important point that I wanted to address today. I know my time is up. In 30 seconds or less, I'd like to just quickly say, if I might, if that's okay, that the outcome here fits within Pearson. So we don't even need to go outside Pearson. I think that almost to the number, the number of drink coupons claimed is 503,000, which is $2.5 million, given that each one is worth $5. I think that the fees here, Judge Conelli's number in the end was $1.6 million, which is about our base load star, a little bit more than our base load star. Under Pearson, the quote is, the presumption should be attorneys' fees awarded should not exceed a third or at most a half of the total amount going to class members and their counsel. So just under that formula alone, we're within the benchmark. So virtually everything Ms. Holyoak said about how we're outside of Pearson or violating it is just flat wrong if you actually just look at the numbers. All right. We have that point. Thank you. Thank you. Mr. Wells. Thank you, Your Honor. May it please the court, I'm Tommy Wells from Maynard Cooper & Gale in Birmingham, Alabama. I'm sure you could tell I was not from the south side of Chicago when I opened my mouth. We can pick that up. Your Honors, if this court is ever to affirm a coupon class action settlement, this is the case. Class relief is adequate as admitted by the objectors. There has been no collusion as also admitted by the objectors and made in factual findings by the district court. The settlement essentially makes the class whole by replacing unlimited number of unused business select drink coupons for other business or other coupons that can be used on southwest flights just like the first coupons. Let me take one minute and talk about the expiration date. Number one, the objectors did not object to the fact that the replacement coupons have an expiration date. And number two, southwest position consistently in this lawsuit was that the original coupons indeed expired on the day of the business select flight because they contained essentially the same information as a boarding pass. No one would rationally think that they could use a boarding pass for yesterday's flight on today's flight. So the coupons that are being distributed are actually more valuable than the coupons that allegedly were taken away. Now, as I see the objection that the objectors have stated in this case, it's not that the class got too little. It's that class counsel may have gotten too much. So what I really see is this is an objection only to the themes and an objection that if it were sustained would not give any benefit to the class. And this is because we set up intentionally the class relief as the coupons. Remember that in the settlement agreement we had agreed to replace all of the coupons. We had no agreement on fees. We had no clear sailing agreement. All we could agree on at the time of the settlement agreement was a bracket of fees. We bracketed fees of between $1.75 and $7 million. With hindsight, as I'm fond of quoting former Auburn coach Pat Dye who always said when someone questioned his play calling, hindsight is always 50-50. With 20-20 hindsight, I would have left the bracket and we probably wouldn't have an appeal. But in order to manage risk, after we had agreed on the settlement, which made the class whole, in order to manage risk, we continued to negotiate for four months to try to come to some agreement on fees. We ultimately were able to come to an agreement that Southwest would not object to a fee request of up to $3 million. But this was after the settlement agreement. It was after the preliminary approval. The preliminary approval order had the bracket. The notice to the class said class counsel is going to claim $7 million in fees, up to $7 million, and we disclosed the bracket. So this is a situation where it's not, as the objectors try to argue, a single pie case. They use the term allocational fairness. That's a clever semantical way of trying to say this is a single common fund case. What they're trying to get to, of course, is the constructive common fund from which they might be able to get fees. But this is not a single common fund case. This is not the pie where if you take a slice, the size of the slice means there is less remaining. This is the pie of the coupons and the cake of the attorney's fees. If, as Judge Connelly did, he took a slice of the cake, it didn't affect the pie, the class relief. And so we submit, Your Honors, when class relief is adequate, when there is demonstrably no collusion, class counsel has ipso facto not sold out the class, and thus a separately negotiated and segregated fee is entirely appropriate. Do you agree with the concerns expressed in Pearson where, for example, if what we had was a settlement that gave the class a quarter of what a successful suit might bring, that the separately negotiated fee would then be a serious problem? Your Honor, there are certainly cases like that where a separately negotiated fee could be a problem. You've done a lot of class settlements, I assume. Have you seen any others where the class got essentially whole relief? I have not, Your Honor. This is the first that I have handled, and quite frankly I think it is a tribute to my client. I know one of the questions— Every one of these that gets used is going to be after somebody's bought another ticket, right? As were the ones that weren't used and they kept or intended to use again. There is really no difference. Let me address the concern because Ms. Holyoak argued defendants are only concerned with the bottom line. Again, what she's arguing is this is a single pie case, and any time you take a slice it diminishes the remainder. This is a different situation, Your Honor. Southwest agreed to class relief because some of its most valuable passengers, those who buy business select tickets at a premium price, had misconstrued the fact that those coupons could only be used on a business select fare on the day of travel. So some of our most important customers, those who pay premium fares, were upset. Our primary motivation in this settlement was to make our business select passengers happy, and that is why we first negotiated the class relief because that was what was most important to our evaluation of the case. Now, in negotiating the class relief, sure, we understood at some point we're going to have to deal with fees. I think I had a reasonable idea of what a load star might be because I keep my time. I knew how much time I had billed to my client, and so I had at least a range that I thought the load star might be. Mr. Siprit was arguing for the $7 million at that time, arguing that the relief was worth $29 million. What we agreed to four months after the class relief was agreed to was to minimize risk on both ends and say if he would give up his request for $7 million, Southwest would not object to three. That's as simple as it was. So the fees in this case do not impact the class relief whatsoever. Your Honor, unless you have... Let me just ask you the base load star amount so I can make sure I have the numbers right. Is the base load star amount around $2 million? Was that the base load star amount? No, Your Honor, it was less than that. The base load star was around $800,000 to $900,000 initially. There was a reconsideration. Judge Cannelli went into great detail in examining the rates that were being charged and modified those. There was a motion to reconsider, and he upped them a little bit. The final award of fees was $1.67 million, not the $3 million, and it was based on a load star with a multiplier of about 1.5 is my recollection. Thank you. If I could address one final point on the class representative. I think the court needs to be aware I did personally depose Adam Levitt. Mr. Levitt complimented me on the thoroughness of my examination after his deposition. I can assure you I looked at every conceivable conflict that he might have. Two things led me not to raise the issue. The first was I didn't believe the conflict that we had disclosed would cause any collusion, any impact on this settlement, and second, I wasn't going to waste my time and money when they had a second class representative who, quite frankly, we viewed as pure as the driven snow. Thank you, Your Honor. Thank you, Mr. Wells. Ms. Olio. Thank you, Your Honors. To address Mr. Sifrit's discussion about the conflict, he argued there was no conflict here because that was a the class counsel relationship was not a family relationship, but it was a business relationship, which I believe is worse because when you are, for example, if they had been awarded a fee in another case and they had to allocate it, there would be money that they would be negotiating. He also argued that if he wasn't allowed to use other class counsel as a class representative, they would never be able to be in a class action. So let me ask you, did you have access to the deposition that Mr. Wells took? No, and I think that is another point, Your Honor, that I'd like to make is that they say that Southwest had notice, but the class members didn't. And another point I'd like to make about that is that to my point that they cannot serve as class members, they can still as class representatives. That doesn't delete their ability to be a class member and to make a claim in any class action that they may be a member in. But more importantly, in Pearson, I think Your Honor asked me whether there was evidence of how this tainted the negotiation. In Pearson, they found that that conflict was a fatal flaw and there was no evidence on how it actually tainted the negotiation, and that's true here. Are you talking about Eubank? Eubank v. Pella, yes, that's 753 F3rd. And then Mr. Siprit argued that the proportion was okay because there were 500,000 claims, which equated to $2.5 million based on the $5 face value. There's two problems with that. The first problem is that the claims came in 13 months after the fairness hearing, or even longer. It was after we filed our opening brief. We didn't know how many claims there were. The district court never considered it. But more importantly, in Redmond v. Radio Shack, the Seventh Circuit looked at $10 coupons. There were 83,000 claims, 830,000 face value, and they said that nominal value was not the actual value going to the class. And for purposes of their analysis, they argued that it should be viewed more at 60% because things chip away at what that value is. If you're handed a coupon that says $10 on it, things take away from that actual value. If you're going to sell it, you're not going to be able to sell it for $10. You can sell it for $9, $8, something less than that. And then the expiration period also chips away. Here, the same thing. We know that on eBay, these things are selling for $3. That's in the docket at 266-1. So we can attribute the market value of that, and that would be $1.5 million. But there's many things that would also chip away at that nominal value because you need to purchase plane tickets to use these, so that we've estimated a generous assumption of $1.5 million, which is still disproportionate. Mr. Wells argues that we're not really arguing 23e fairness because we're only challenging the fees. But that's not true. We are arguing the division of a settlement pie, as the Seventh Circuit noted in Pearson and Redman, and that was the theory that was brought under both of those cases. And the problem here is he said there's no pie here because there was a separate negotiation. Well, that is the same exact argument that was made in Pearson and Redman. They had a separate fee. But the district court must look at all of it, particularly under our theory where there should be no reversion. There is no justification for the class allowing such a structure. $1.6 million could have gone back to the class. It's just as easy to send a coupon with a $2.60 check, even though it's likely that based on the number of class members, it would be higher than that. We don't know the number of class members. They revealed the number of claims, which was 500,000, but never revealed the number of class members. But we do know that over 2 million received nothing. So claiming that this is adequate and whole, that is not true. I'm going to have to ask you to make some concluding remarks now. Oh, sure, Your Honor. Your Honor, Pearson and Redman are directly on point. The district court erred there as a matter of law because it did not even consider the division, the allocational fairness of that settlement between the class counsel and class members. Here there was $1.5 million coupons and $3 million going to the attorneys, which is 67%, which is impermissible under Redman. Thank you, Your Honors. Thank you, Michelle. Thanks to all counsel. The case is taken under advisement. The court will proceed to the third case of the day.